# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMANJIT SINGH HUNDAL, | Case No.: 1:19-cv-00338-DAD-JLT (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| RALPH DIAZ, | [THIRTY DAY OBJECTION DEADLINE] |
| Respondent. | |

Petitioner is currently serving a sentence of 39 years, plus 90 years to life consecutive, plus two consecutive terms of life without the possibility of parole for his conviction of two counts of murder, attempted murder, shooting at an occupied vehicle, shooting from a vehicle at a person, assault with a semiautomatic firearm and street terrorism. He filed the instant habeas petition challenging the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED**.

## I.  PROCEDURAL HISTORY

In three separate cases that were consolidated for trial, Petitioner was charged with and convicted of two counts of murder, attempted murder, shooting at an occupied vehicle, shooting from a vehicle at a person, assault with a semiautomatic firearm and street terrorism. People v. Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *1 (Cal. App. 5th Dist. Aug. 2, 2017). Various street gang and firearm enhancements were found true. Id. On September 10, 2014, the trial court sentenced Petitioner

1

to a total prison term of 39 years, plus 90 years to life consecutive, plus two consecutive terms of life without the possibility of parole. Id.; (Doc. 22 at 7.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On August 2, 2017, the California Court of Appeal, Fifth Appellate District struck two gang enhancement ten-year terms and corrected various errors in the abstract of judgment related to fines and restitution. Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *2. The judgment was otherwise affirmed. Id.

On October 3, 2017, Petitioner filed a petition for review with the California Supreme Court raising two claims: (1) denial of due process for the murder conviction and the related special circumstances allegations because there was insufficient evidence that Petitioner knew of and shared the shooter's intent to kill (claim 1); and (2) denial of due process because the trial court failed to instruct the jury *sua sponte* with CALCRIM No. 225 (circumstantial evidence of specific intent) instead of CALCRIM No. 224 given that the primary issue at trial was whether Petitioner harbored the specific intent to kill (claim 2). (Docs. 13-3, 13-4.) On November 15, 2017, the California Supreme Court denied review. (Doc. 13-4.)

On March 13, 2019, Petitioner filed the instant federal habeas corpus petition in this Court. (Doc. 1.). Petitioner raised seven claims in his petition: (1) insufficient evidence for the murder conviction; (2) failure to instruct the jury with CALCRIM No. 225; (3) insufficient evidence for gun use enhancements; (4) improper imposition of sentences for both the gang and gun enhancements in count six; (5) ineffective assistance of counsel; (6) denial of the right to a fair trial and the presumption of innocence; and (7) cumulative error. (Doc. 1.)

On the same day, he filed a habeas petition in the California Supreme Court, raising three claims: (1) ineffective assistance of trial and appellate counsel (claim 5); (2) denial of the right to a fair trial and presumption of innocence (claim 6); and (3) cumulative error (claim 7). (Doc. 13-5.)

On May 9, 2019, Respondent filed a motion to dismiss the habeas petition because it included unexhausted claims. (Doc. 12.) Specifically, Respondent argued that because the three claims raised in the habeas petition in the California Supreme Court (claims five, six and seven) were still pending at that time, those claims were unexhausted. (Doc. 12 at 3.) Respondent also contended that claims three

and four of the federal petition were unexhausted because they had not been presented to the California Supreme Court. (Doc. 12 at 4.) Petitioner filed objections on May 28, 2019, contending that he anticipated the habeas petition in the California Supreme Court to be denied within a timely manner or in the alternative he requested for a stay. (Doc. 14 at 1-2.) Respondent did not file a reply to the opposition.

On June 24, 2019, Petitioner filed "motion to show the courts and also respondent that all claims filed in original petition for writ of habeas corpus are now dully [sic] and fully exhausted therefore the respondent's motion to dismiss a mixed petition is moot and respondent should answer petition originally filed." (Doc. 17.) Petitioner included as an exhibit the California Supreme Court's order denying the habeas petition on June 12, 2019. (Doc. 17 at 4.) Petitioner contended in his motion that all his claims are now fully exhausted, and Respondent's arguments in the motion to dismiss are moot. (Doc. 17 at 1-2.) Petitioner also abandoned his request for a stay, stating that was also moot. (Doc. 17 at 2.) Respondent construed Petitioner's "motion" as a motion to amend his petition and filed opposition on July 3, 2019. (Doc. 18.) Respondent contended that claims five, six and seven were exhausted as of Petitioner's motion filed on June 24, 2019. (Doc. 18 at 4.) However, Respondent argued that these claims (claims five, six and seven) were untimely. (Doc. 18 at 5-6.) Respondent also argued that claims three and four remained unexhausted because they had never been presented to the California Supreme Court, so the petition is mixed. (Doc. 18 at 4-5.)

Petitioner then filed a motion to amend on July 22, 2019, requesting the Court to exclude unexhausted claims and proceed on the merits of exhausted claims. (Doc. 19 at 1-2.) Respondent did not file an opposition.

The Court denied Respondent's motion to dismiss as moot. (Doc. 27 at 2.) The Court also denied as moot Petitioner's request for a stay, which he had later withdrawn. (Id.) Additionally, the Court granted in part Petitioner's motion to amend, for Petitioner to proceed on his claims one and two and to permit Petitioner to abandon his claims three and four. (Id.) Finally, the Court dismissed claims five, six and seven *sua sponte* as untimely under the AEDPA's statute of limitations. (Id.)

On November 5, 2019, Respondent filed an answer on the remaining claims of the petition. (Doc. 22.) On January 7, 2020, Petitioner filed a traverse. (Doc. 28.)

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

*January 9, 2009, Jose Pacheco Murder (Counts 3 and 4)*

On the evening of January 9, 2009, the Pacheco family was outside in front of their home in Reedley when a car drove past and someone began shooting. Just prior to the shooting, another neighbor saw a car with four males drive past the house, turn around and drive by again, slowly with its headlights off.

Jose Pacheco died from a gunshot wound in the shooting. Javier Pacheco, Jose Pacheco's uncle, saw a small green hatchback drive around the block and start shooting when it returned, but he did not see the faces of anyone in the vehicle. Jose Pacheco's fiancée, Diana Heredia, also saw the car, which she described as turquoise or blue/green with two doors and tinted windows, drive past. She caught a glimpse of a hand out the passenger window but did not see a gun.

Six nine-millimeter shell casings were collected at the scene. At trial, the parties stipulated that the shell casings from the scene shared the same class characteristics as those associated with a firearm found in April of 2009 at the home of Norteño gang member Saltan Zagsaw. It was also stipulated that one of the cartridges from the shooting had been fired from that same gun; the other five were not tested.

Evidence of the following was presented at trial. In early 2008, the victim Jose Pacheco, a Bulldog gang member, had gotten into a fight with Jose Bastida, a Norteño Varrio Eastside Reedley (VESR) gang member, who lived down the street from the Pacheco family. Members of both families were involved in the fight. Police came and arrests made, but the charges were later dropped.

After the January 2009 shooting, gang-related graffiti appeared on the Pacheco's fence three or four times. In late January of 2009, Luis Flores was contacted by a police officer, who noted Flores was sporting a new "BFK" tattoo, which stands for Bullfrog Killer, Bullfrog being a derogatory term for a Bulldog gang member.

In April of 2009, police stopped Hundal's vehicle for a broken headlight and a cracked windshield. At the time, Bastida was a passenger in the car. Hundal appeared very nervous and was sweating profusely; Bastida was belligerent. A .38-caliber revolver was found under the front passenger seat of the vehicle.

During a jail classification in September of 2010, Hundal was noted as being an active VESR Norteño gang member.

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

4

*September 12, 2010, Juan Negrete Murder and Anselmo Salinas Robles Attempted Murder (Counts 1, 2 and 7)*

On September 12, 2010, Jose Salinas was outside his home on Jefferson Avenue in Reedley, working on a car with his uncle, Anselmo Salinas Robles, and a friend, Juan Negrete. Jose Salinas was sitting inside his truck when he heard gunfire and saw silhouettes of two people standing by the curbside mailboxes. When he got out of the car, Jose Salinas discovered Negrete had been killed and his uncle wounded. Anselmo Salinas Robles heard the gunshots and fell after being shot in the lower back and leg. He passed out after police arrived.

Just before the shooting, a nearby neighbor saw a dark car pass by her house, but did not see how many people were inside the vehicle. She saw two people walk toward the mailboxes at the corner of Cedar and Jefferson and then heard what sounded like fireworks and saw flashes of light.

Another neighbor was out watering his lawn when he heard gunfire coming from two different guns. He then saw two people run down Cedar Street and get into what he believed was a Honda Civic.

Police officers found two spent shell casing near the mailboxes. A total of 10 .30-caliber shell casings were recovered from the scene, all headstamped "RP 30 Carb." A month later, police found a .30-caliber semiautomatic rifle in Adrian Mendoza's bedroom. The parties stipulated that nine of the 10 cartridges recovered from the scene had cycled through the M1 .30-caliber rifle found in Mendoza's bedroom; one casing lacked sufficient detail for comparison.

Detective Janie Ortiz testified Hundal admitted being present during the shooting. At one point, Hundal said there were six people in one vehicle: himself, Manuel Gonzales, Edgar Padilla, Ricardo Villanueva, Juan Hernandez and Luis Flores.

*September 16, 2010, Foster's Freeze Shooting (Counts 5 and 6)*

On September 16, 2010, Pedro Ochoa drove a coworker to the Foster's Freeze in Reedley for a meal. While waiting for their food, Ochoa noticed a teenager dressed in black inside Foster's Freeze. An older, Arab-looking "cholo" in a red shirt spoke with the teenager and then yelled at Ochoa to come outside. Ochoa did not respond, got their food and began to drive away. Ochoa then saw the "cholo" standing at the corner by the alley; he had a black handgun and fired two shots at Ochoa's vehicle, one shot striking the passenger door.

David Vaughn was at the Foster's Freeze during the incident and noticed some men having angry words with someone inside. Vaughn told police the man who was yelling was wearing red Converse shoes. Vaughn noticed Ochoa's vehicle drive away and saw a man standing nearby. Within seconds, he heard shots fired, but did not see a gun.

5

Both Ochoa and Vaughn identified Hundal from a photographic lineup; Ochoa as the man who shot him and Vaughn as the man inside the Foster's Freeze yelling at Ochoa.

An officer found two spent .380-caliber shell casings by the alleyway where the shooting occurred. Shortly after midnight, officers executed a search of Hundal's home and located a .380 automatic handgun. Officers also located a pair of red and white Converse shoes in Hundal's bedroom, as well as a gun cleaning kit. The parties stipulated that the gun found in Hundal's home had been test fired and matched the shell casings found at the scene of the shooting.

When interviewed by police, Hundal said some people at the Foster's Freeze were making fun of a "fat kid" who asked for help. Hundal went to challenge the men, but they declined to come outside, so Hundal walked home. When officers told Hundal there had been a shooting and he had been identified as the shooter, Hundal denied being the shooter. He then put his head down and said he did not want to talk anymore.

*Confidential Informant Cesar Garcia*

Cesar Garcia, a long time VESR gang member, contacted police in 2010 after deciding to drop out of the gang. In exchange for a new identity and relocation, Garcia agreed to help law enforcement as a confidential informant and record conversations with other gang members. Garcia recorded many conversations with fellow gang associates/members and periodically met with Detective Kramer, who would then transfer the recordings to a computer. As part of the agreement, Garcia testified at various trials and preliminary hearings.

Garcia and two other seasoned gang members created a "Council of Three" responsible for making gang-related decisions for the local area. In this capacity, Garcia recorded a conversation with Hundal on July 29, 2010. Garcia was familiar with Hundal, who he referred to as "Punjabi" or "Rico." According to Garcia, Hundal was an associate of VESR until 2010, when he became a member.

In the recorded conversation, Hundal admitted being with Flores and Bastida when Pacheco was killed. Hundal told Garcia they were in his "little blue bucket," a Toyota Tercel Hundal later sold. Hundal said they were looking for "scraps," and "I just rolled up on them and he put one foot outside and lit 'em up," Hundal described the gun as a "little[] one that shoots out nines," the same gun a "homie" got caught with in Fresno. They spoke about Flores being the shooter, but that he talked too much and had told others Hundal was the driver.

Garcia also recorded conversations with Flores about the Pacheco murder. He admitted killing Pacheco and said he was with Bastida and Hundal and that Hundal was the driver. Flores said he used a "Tech 9," the one Zagsaw was later caught with.

Hundal also implicated himself with regard to the Negrete murder, telling Garcia, "I

6

lit that up," and "I seen the dad get hit on the shoulder," and that one person tried to run and then fell. Hundal said he unloaded the whole clip and then took off.

Garcia recorded a conversation with Villanueva, who said he sold a long barrel Ruger after he and Hundal committed the Negrete shooting. Villanueva further disclosed it was his first shooting and that Hundal had really "pumped [him] up." Villanueva told Garcia they had driven by the men outside and then drove back and parked. When Hundal "let loose," he did the same, and they then ran back to the car and dropped the guns off at Hector Trejo's house.

Garcia was in jail in Tulare County in late August and early September 2010 for drunk driving and various parole violations. The parties stipulated that Garcia was arrested for aggravated domestic violence in September 2013. Garcia received $99,613.47 in relocation benefits over three and a half years, some of it was paid directly to him and some directly to pay rent.

*Coconspirator Testimony on the Negrete Murder*

Anthony Gonzalez (Anthony) pled guilty to reduced charges for his role in the Negrete killing in exchange for a 22-year sentence and his agreement to testify. He initially denied participation in the event but, after detectives played a recording of him talking with Garcia and Juan Hernandez, Anthony decided to disclose his role in the shooting.

According to Anthony, a day before the shooting, a group of gang members were mourning the loss of another gang member and wanted revenge by shooting some Sureños. The following day they gathered at an abandoned house; Hundal showed up there with a rifle. Anthony heard Hernandez, Padilla and others talk about going out to shoot a couple of houses. Hernandez planned that some of the group would go out and create a distraction by setting a fire on the opposite side of town. They had a police scanner to monitor activity, and once the fire was reported, Hernandez planned to call Padilla. Two cars of gang members drove off and Anthony stayed behind with Hernandez. Later, Hernandez had Anthony go out and break some windows to create another distraction. After everyone returned, Hundal appeared happy and bragged about shooting some "scraps."

Manuel Gonzalez (Manuel) was also charged in the Negrete murder and pled guilty to reduced charges in exchange for a 24-year state prison sentence and his agreement to testify. He also spoke to Garcia about the shooting and his recorded statements were played at trial.

According to Manuel, Hernandez and Padilla contacted him about being a driver that night; he had a Nissan Altima. Earlier in the day at the abandoned house, Manuel heard Padilla and Hernandez talk about the shooting; Hernandez wanted to shoot people, but Padilla just wanted to shoot at houses. At about 7:00 in the evening, Manuel was at the abandoned house with Hundal, Villanueva, Ramirez, Anthony, Hernandez and Padilla. Hernandez appeared to be in charge.

7

Manuel drove with Padilla and Hundal in one car; Ramirez and Villanueva were in another car. When they drove around the homes of some Southsiders and saw no one, Hundal suggested another house on Jefferson, so they drove there and saw people out on the driveway. After some discussion between the two cars, they drove near the house and Hundal and Villanueva got out, both carrying guns. After Hundal and Villanueva returned to the car, they drove to Hector Trejo's house where Hundal and Villanueva dropped off the guns and washed their hands. Manuel heard Hundal tell someone over the telephone, "someone's down, someone got shot."

Edgar Padilla testified at trial pursuant to a plea agreement whereby he received a 24-year sentence for his role in the shooting. Padilla helped plan the "retaliation" shooting after being contacted by Hernandez and Luna. Luna told Padilla they would use the M1 rifle, and Padilla was present when Hundal and Anthony came by Richie Varela's house to pick up the rifle. Padilla was also present at the abandoned house on the night of the shooting when Hundal had the M1 rifle inside and loaded it.

According to Padilla, Hundal volunteered to be one of the shooters, as did Villanueva. Padilla drove around with the others looking for houses to shoot at, but no one was outside. After Hundal suggested a different location, they drove to the east side of town. There Hundal and Villanueva got out of the car and Padilla heard a lot of gunshots coming from both the rifle and the .44 revolver, which was louder. Hundal and Villanueva ran back to the car and they sped off. According to Padilla, Hundal was happy.

Padilla initially lied about some of the events when he was interviewed by police following his arrest, but eventually gave them the full story. Padilla also told police he knew about the Pacheco murder and disclosed that Flores was the shooter, Hundal the driver and another person, "Chemma," was also in the car.

*Gang Affiliation*

A few days prior to the Negrete murder, Hundal was detained while riding a bicycle at midnight without a light. He initially tried to flee, but crashed the bicycle. At the time, Hundal had a gun and what looked like methamphetamine in his possession. He was wearing red clothing and a hat with a huelga bird, indicative of gang membership. He admitted being a Norteño gang member for about two years.

Gang expert Detective Kyle Kramer testified that the VESR is a subset of the Norteño gang. He testified the primary activities of the VESR include murder, attempted murder, drive-by shootings, assault with deadly weapons, drug sales and weapon possession. He testified about approximately seven predicate offenses committed by other VESR gang members.

Detective Kramer reviewed a packet of information relating to Hundal and opined that he was an active participant in VESR in January of 2009 and September of 2010 when the murders occurred. The material included Hundal's self-admission, his attire, and information about prior police contacts. In response to question involving

8

hypothetical facts paralleling the facts of the three charged shootings, Kramer opined each shooting was committed to benefit the gang.

Detective Kramer acknowledged most VESR and Norteño gang members are Hispanic; Hundal was East Indian. When Hundal was arrested, he claimed to be a Sacramento County Crip and showed a Crip tattoo, although most Crips are African American. Although Hundal had no Norteño or VESR tattoos and was wearing blue, a Crip's color, when arrested in 2010, Kramer still believed Hundal was an active participant in VESR.

Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *5-17.

### III. DISCUSSION

#### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

#### B. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had

"a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

    C.    Review of Petition

The petition presents the following remaining claims for relief: (1) The evidence was insufficient to support the conviction; and (2) The trial court incorrectly instructed the jury on how to evaluate circumstantial evidence.

    1.    Insufficiency of the Evidence

Petitioner contends that there was insufficient evidence to convict him of Pacheco's murder. He argues that nothing demonstrated his intent to kill the victim because the evidence only indicated that Petitioner was the driver the night of the murder. (Doc. 1 at 5-7.) Petitioner raised this claim on direct review in the state courts. In the last reasoned decision, the appellate court denied the claim as follows:

> We first address Hundal's challenge to the sufficiency of the evidence supporting his conviction for the Pacheco murder. There was no evidence presented Hundal personally fired the shots from the vehicle and Hundal's claim is that there is insufficient evidence to prove he shared the direct perpetrator's intent to kill Pacheco. Hundal contends "the evidence at most showed [Hundal] intended to participate in a shooting but not that he intended anyone actually be shot or killed." As will be explained, the guilty verdict is supported by substantial evidence and Hundal's challenge to his conviction lacks merit.
>
> *Standard of Review*
>
> In reviewing the sufficiency of the evidence to support a conviction, this court must determine "'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13, 36 Cal. Rptr. 2d 474, 885 P.2d 887.) Under this standard, we review the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of the judgment, to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496, 117 Cal. Rptr. 2d 45, 40 P.3d 754; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11, 82 Cal. Rptr. 2d 413, 971 P.2d 618.)

In making this determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be given the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) Instead, we consider whether "'*any* rational trier of fact could have found the essential elements of [the charged offense] beyond a reasonable doubt.'" [Citation.]" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081, 248 Cal. Rptr. 510, 755 P.2d 960, original italics.) The conviction will not be reversed unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury. [Citation.]" (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429, 180 Cal. Rptr. 391.)

*Applicable Law and Analysis*

The jury was instructed a conviction of first degree murder required that the crime was committed willfully with premeditation and deliberation or it was committed by shooting a firearm from a motor vehicle. Both theories required proof of intent to kill. The prosecutor argued Hundal, as a nonshooter, was guilty of first degree murder as either an aider and abettor or as part of an uncharged conspiracy to commit murder.

"A person aids and abets the commission of a crime when he or she (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164, 282 Cal. Rptr. 450, 811 P.2d 742.) "The mental state necessary for conviction as an aider and abettor, however, is different from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged .... An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.] The jury must find 'the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense ....' [Citations.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123, 77 Cal. Rptr. 2d 428, 959 P.2d 735, original italics.)

Likewise, to prove a defendant was a member of a conspiracy, the prosecution must prove, inter alia, the defendant intended or agreed with one or more of the others to commit first degree murder and intended that one of the members of the conspiracy would, in fact, commit first degree murder at the time they made the agreement, and committed an overt act in furtherance of the conspiracy. (CALCRIM No. 416.)

Hundal concedes the evidence showed that Flores, the shooter, "either premeditated killing Pacheco or intended to kill him during the drive-by shooting by virtue of the fact he had [Hundal] slow down and stop so he could shoot the gun." However, Hundal claims, "this does not mean [he] knew of and shared the same intent" and that the record "is devoid of any evidence to show he knew Flores intended to kill anyone or that [he] shared such intent." We disagree.

> "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. [Citations.]" (*People v. Pre* (2004) 117 Cal.App.4th 413, 420, 11 Cal. Rptr. 3d 739.) Here, the facts and circumstances surrounding the January 2009 Pacheco murder included evidence that Hundal, Flores and Bastida were all active VESR gang members at the time of the murder. Although Hundal claims he was a "relative newcomer to the area and to VESR" and had "no history with the Pacheco family like Bastida," the prosecutor presented evidence which tied Hundal to the gang. Specifically, that Hundal admitted in September of 2010 that he had been a Norteño gang member for about two years. The VESR is a Norteño subset and the Sureños and Bulldogs were their main rivals.
>
> Additional evidence was presented that, 10 months before the murder, Pacheco, a rival Bulldog gang member had gotten into a fight with Bastida, who lived down the street from Pacheco. In July of 2009, Hundal and Bastida were stopped together while in a vehicle, and a gun found in the car. Also in July of 2009, Hundal had a conversation with confidential informant Garcia, in which he referred to various people in the VESR gang by their monikers and showed Garcia a gun given to him by one member of the gang who the gang expert described as "overall responsible for the activities of the [VESR] gang."
>
> The prosecutor presented evidence that Hundal admitted to Garcia that the Pacheco murder had taken place because "[w]e were looking for scraps, there were no scraps so we just ended up finding them. They just ended up being there." Hundal laughed when he told Garcia they "just rolled up on them and [Flores] put one foot outside and just lit 'em up." Hundal admitted driving the car during the incident, and that they had been looking at a house where he "bucked at the other day," but no one was there so they went to the north side. There was evidence that Hundal then drove the car past Pacheco's residence and went around the block and returned to Pacheco's residence, this time driving slowly with the headlights off, and then the shooting began.
>
> From the entirety of this evidence, a reasonable trier of fact could infer Hundal aided and abetted the drive-by shooting, that Flores possessed the intent to kill and that Hundal, with the knowledge of Flores's intent to kill and for the purpose of assisting him in carrying out that intent, drove past the house in such a way as to allow Flores to more accurately fire at Pacheco in order to kill him. We reject Hundal's argument to the contrary.

Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *17-23.

    *a.    Legal Standard*

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the

13

record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson,

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

      *b.    Analysis*

Viewing the evidence in the light most favorable to the prosecution, it is clear that the state court's determination that there was sufficient evidence was not unreasonable. As noted by the state

court, Petitioner's fellow gang members had been in an altercation with Pacheco prior to the shooting. Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *21-22. Additionally, Petitioner admitted driving the car during the incident, and there was evidence that after Petitioner drove the car past Pacheco's residence and went around the block and returned to Pacheco's residence, he then drove slowly with the headlights off, and then the shooting began. Id. at *22-23. The state court reasonably concluded from the entirety of this evidence that "a reasonable trier of fact could infer Hundal aided and abetted the drive-by shooting, that Flores possessed the intent to kill and that Hundal, with the knowledge of Flores's intent to kill and for the purpose of assisting him in carrying out that intent, drove past the house in such a way as to allow Flores to more accurately fire at Pacheco in order to kill him." Id. at *23.

Petitioner fails to show that no fairminded jurist would agree with the state court's determination. Petitioner fails to demonstrate that the state court rejection of her claim was contrary to, or an unreasonable application of, the Jackson standard, and the claim should be denied.

2.  Instructional Error

Petitioner next contends that the trial court incorrectly instructed the jury on how to evaluate circumstantial evidence. (Doc. 1 at 5.) Specifically, Petitioner argues that the trial court erred in instructing the jury with CALCRIM No. 224, rather than CALCRIM No. 225. Petitioner raised this claim on direct review in the state courts. In the last reasoned decision, the appellate court denied the claim as follows:

> The jury was instructed on how to consider circumstantial evidence in accordance with CALCRIM No. 224 as follows:
>
> "Before you may rely on circumstantial evidence to conclude that a fact necessary to find defendant guilty has been proved, you must be convinced that the people have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilty, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

15

Hundal contends the trial court erred in instructing the jury with CALCRIM No. 224, rather than CALCRIM No. 225. He argues CALCRIM No. 225 is to be used in lieu of the more general CALCRIM No. 224 because a primary contested issue at trial was whether Hundal shared Flores' specific intent to kill Pacheco. We find no prejudicial error.

*Applicable Law*

The trial court is required to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 77 Cal. Rptr. 2d 870, 960 P.2d 1094.) CALCRIM No. 224 states such a principle that must be given sua sponte on those occasions when it is applicable. (*People v. Wiley* (1976) 18 Cal. 3d 162, 174, 133 Cal. Rptr. 135, 554 P.2d 881 [discussing CALJIC No.2.01]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49, 286 P.2d 1.) It is applicable only when the prosecution substantially relies on circumstantial evidence to establish any element of the case. (*People v. Yrigoyen, supra*, at p. 49; CALCRIM No. 224, Bench Notes.) The instruction should not be given where circumstantial evidence is incidental to and corroborative of direct evidence. (*People v. Anderson* (2001) 25 Cal.4th 543, 582, 106 Cal. Rptr. 2d 575, 22 P.3d 347; *People v. Malbrough* (1961) 55 Cal.2d 249, 250-251, 10 Cal. Rptr. 632, 359 P.2d 30.)

CALCRIM No. 225 is to be used in place of CALRIM No. 224 "when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence." (*People v. Honig* (1996) 48 Cal.App.4th 289, 341, 55 Cal. Rptr. 2d 555 [discussing CALJIC No. 2.02]; see Bench Notes to CALCRIM Nos. 224 and 225.) CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142, 36 Cal. Rptr. 2d 235, 885 P.2d 1 [discussing CALJIC Nos. 2.01 and 2.02].)

*Analysis*

Hundal's argument is based on the premise that there was "no other circumstantial evidence being relied on to prove the charged offenses" other than proving his intent in the Pacheco murder. However, a large part of the People's case was founded on circumstantial evidence. For instance, the prosecution relied on circumstantial evidence of appellant's gang membership to show elements of the street gang enhancements, and the fact that Hundal and Flores went "looking for scraps" to show they acted with premeditation and deliberation in killing Pacheco. Thus, the trial court correctly instructed the jury with CALCRIM No. 224 instead of the narrower CALCRIM No. 225.

In any event, any error in instructing with CALCRIM No. 224 was harmless by even the most stringent beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705. Because the trial

court defined circumstantial evidence with CALCRIM No. 223 and delivered the more inclusive instruction under CALCRIM No. 224, as well as instructing on the union of act and intent with CALCRIM No. 251, its failure to instruct with CALCRIM No. 225 clearly was not prejudicial error. (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1142.) CALCRIM No. 224 adequately told the jury how to evaluate circumstantial evidence with regard to motive and intent, as well as the other elements of the crimes. We reject Hundal's claim to the contrary.

Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *23-26.

### a. *Legal Standard and Analysis*

Respondent correctly asserts that Petitioner fails to present a federal claim, since Petitioner is challenging the application and interpretation of state law. It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law"); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings). Petitioner challenges the trial court's instructing the jury with CALCRIM No. 224, rather than CALCRIM No. 225. Such challenge does not give rise to a federal question cognizable on federal habeas review. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Thus, the claim is not cognizable on federal habeas and should be rejected.

Even if the Court found the claim cognizable, it would be without merit. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but they are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998). In this case, Petitioner fails to show any prejudice. As noted by the appellate court, the trial court correctly instructed the jury with CALCRIM No. 224 instead of the narrower CALCRIM No. 225. Hundal, 2017 Cal. App. Unpub. LEXIS 5307, at *25. The appellate court found no prejudicial error and reasonably concluded that CALCRIM No. 224 adequately told the

jury how to evaluate circumstantial evidence with regard to motive and intent, as well as the other elements of the crimes. See id. at *26.

Accordingly, the claim fails to present a cognizable federal claim. Moreover, Petitioner fails to establish that the state court's determination was contrary to or an unreasonable application of Supreme Court authority. The claim should be denied.

## IV. RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **February 12, 2020**  **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE